DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

ROSS E.WEINGARTEN (NYBN 5236401)
SHAILIKA S. KOTIYA (CABN 308758)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6747
    FAX: (415) 436-7234
    ross.weingarten@usdoj.gov
    shailika.kotiya@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 17-204 JD |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | Sentencing Date: October 16, 2019 |
| EUGENE LATRELL MCNLEEY, | Time: 10:30 a.m. |
| Defendant. | Judge: Hon. James Donato |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

OFFENSE CONDUCT .........................................................................................................2

CRIMINAL HISTORY .........................................................................................................5

SENTENCING GUIDELINES CALCULATIONS ...............................................................6

        A.        Undue Influence Enhancement Should Apply........................................6

        B.        Acceptance of Responsibility .................................................................8

SENTENCING RECOMMENDATION .................................................................................9

    A.     Applicable Law ..............................................................................................9

    B.     A Sentence of 192 Months' Imprisonment Would Vindicate the Interests Set
           Forth in 18 U.S.C. § 3553(a) ........................................................................10

CONCLUSION.....................................................................................................................13

1

## **TABLE OF AUTHORITIES**

2
*Page(s)*

3
*Cases*

*Gall v. United States*, 552 U.S. 38, 50 (2007) .................................................................. 10

*Kimbrough v. United States*, 552 U.S. 85, 108, (2007) ...................................................... 9

*United States v. Armstead*, 552 F.3d 769, 777-78 (9th Cir. 2008)………………………………………10

*United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) ........................................... 9, 10

*United States v. Ellis*, 641 F.3d 411, 415 (9th Cir. 2011) ................................................. 10

*United States v. Hagen,* 641 F.3d 268, 271 (8th Cir.2011)................................................. 8

*United States v. Hornbuckle*, 784 F.3d 549, 555 (9th Cir. 2015) ..................................... 7, 8

*United States v. Miller,* 601 F.3d 734, 737–38 (7th Cir.2010) ............................................ 8

*United States v. Munoz-Camarena*, 631 F.3d 1028, 1030 (9th Cir. 2011) ........................ 10

*United States v. Reid,* 751 F.3d 763, 768 (6th Cir.2014) .................................................... 8

*United States v. Treadwell*, 593 F.3d 990, 1001 (9th Cir. 2010)………………...…………………10

*United States v. Watkins,* 667 F.3d 254, 265 (2d Cir.2012) ............................................... 8

14

15
*Statutes*

18 U.S.C. § 2423...................................................................................................................... 1

18 U.S.C. § 1591...................................................................................................................... 1

18 U.S.C. § 3553......................................................................................................... 9, 10, 13

18
*Rules*

U.S.S.G. § 2G1.3(a)(3) ........................................................................................................... 6

U.S.S.G. § 2G1.3(b)(2)(B) ...................................................................................................... 6

U.S.S.G. § 2G1.3(b)(4)(A) ...................................................................................................... 6

U.S.S.G. § 2G1.3(b)(3)(A) ...................................................................................................... 6

23

24

25

26

27

28

## I.    INTRODUCTION

On October 3, 2015, the defendant, Eugene Latrell McNeely, drove from Oakland to Salem, Oregon, where he picked up a 14-year old girl ("H.S.") with whom he had been communicating for months on social media and through phone calls and texts.  When the defendant arrived, H.S. snuck out of her mother's house and got into the car with the defendant, whom she had never met before. McNeely drove her back to Oakland where, the very next day, H.S. began working for him as a prostitute.  A few weeks later, the defendant drove to Las Vegas to pick up another woman, A.S., who thereafter worked as a prostitute for the defendant because he provided her with the heroin that she so desperately needed to feed her addiction.

From October 2015 until their arrest in January 2016, H.S. and A.S. worked for the defendant, their pimp, seven days a week, performing sex acts on strangers and then giving *all* of their earnings to the defendant.  Both H.S. and A.S. were raped, on separate occasions, while they worked for the defendant.  Each time, the defendant showed far more concern about making more money, rather than caring for their well-being.  The defendant also regularly physically beat H.S. and A.S., and he used guns to intimidate them and make them continue working for him.  While the victims in this case suffered, the defendant profited from their acts of prostitution, making thousands of dollars.  H.S. and A.S. were only freed from the defendant's control after they were arrested in January 2016 on "the blade," the strip of International Boulevard in Oakland, California, where the defendant often pimped H.S. and A.S..  The arrest was a product of a law enforcement investigation into the whereabouts of H.S., a teenager reported missing from the state of Oregon.

The defendant was originally charged on April 20, 2017 in a one count Indictment with Transporting a Minor for Prostitution in violation of 18 U.S.C. § 2423.  Dkt. No. 1.  He pled guilty to that count on May 23, 2018, Dkt. No. 52, but later requested to withdraw his plea agreement and go to trial, Dkt. No. 59, which the Court granted.  The government then charged the defendant in a Superseding Indictment with the original count plus three additional counts:  Sex Trafficking of Children, in violation of 18 U.S.C. § 1591(a)(1), (b)(2) (Count Two); and Sex Trafficking by Force,

1

Fraud, or Coercion, in violation 18 U.S.C. § 1591(a)(1), (b)(1) (Counts Three and Four).  Counts one and two of the Superseding Indictment carry 10-year mandatory minimum sentences, while counts three and four carry 15-year mandatory minimum sentences.

The defendant now stands before the Court to be sentenced after pleading guilty to Count One of the Superseding Indictment, which carries a 10-year mandatory minimum.[1]  The government respectfully submits that a lengthy prison sentence is necessary in this case both to punish the defendant's violent and harmful conduct and to protect the community.  For the reasons set forth below, the United States respectfully requests that the Court sentence defendant to 192 months of imprisonment, a lifetime of supervised release, a $100 special assessment, and restitution (in an amount to be determined), for his egregious conduct in this case.  This sentence takes into account the serious nature and circumstances of the offense, defendant's history and characteristics, promotes respect for the law, affords adequate deterrence, and protects the public from future crimes of the defendant.  The United States believes this sentence is sufficient, but not greater than necessary, to accomplish the goals of sentencing.

## II.    OFFENSE CONDUCT (PSR ¶¶ 9-41)

The PSR accurately sets forth the conduct in this case.  The defendant was a pimp who lived and worked primarily in Oakland, California.  In the spring and summer of 2015, he met H.S., the minor victim in this case, on Facebook.  PSR ¶ 19.  H.S. was 14-years old at the time.  *Id.* ¶ 10.  They began communicating and the defendant led H.S. to believe that if she moved to Oakland, they would begin a romantic relationship and would make money together.  *Id.*  ¶ 19.  The defendant convinced H.S. that he led an extravagant lifestyle by sending her, among other things, pictures of fancy cars and clothes.  The defendant also posted photographs on social media of piles of cash, fancy cars, and provocatively dressed women, suggesting that he was rich and lived an attractive lifestyle.  *Id.* ¶ 16.  At the time, things were not going well for H.S.: her mother was sick, she was getting in trouble in school, and wanted to leave home.  *Id.* ¶ 29.  By virtue of what was going on in her life at the time, H.S. was the perfect target for the defendant, who intended throughout his courtship of her that she would work for

---

[1] The government has made no promises as to the disposition of the remaining counts.

1  him as a prostitute and make money for him.

2  On October 3, 2015, the defendant drove from Oakland to Salem, Oregon, where he picked H.S.

3  up at her mother's house and they headed back to Oakland.[2]  *Id.* ¶ 20.  On their drive back to Oakland,

4  the defendant gave H.S. a fake ID to buy alcohol and marijuana.  *Id*.  When they arrived in Oakland, the

5  defendant took H.S. to the Parklane Motel in Oakland where another woman who H.S. came to know as

6  "Kiki" was sleeping in his motel room.  *Id*.

7  The very next day, the defendant took H.S. shopping and to his mother's house, where his

8  mother presented H.S. with a large collection of skimpy clothing and allowed H.S. to pick out clothes to

9  wear when working as a prostitute for the defendant.  That evening, the defendant took H.S. and the

10  other woman in the motel room to International Boulevard, which is a high-prostitution area in Oakland.

11  *Id*.  There, H.S. learned how to solicit customers on the street in order to perform sex acts on them in

12  exchange for money.  From that day until her arrest on January 21, 2016, H.S. worked as a prostitute

13  seven days a week for the defendant, who controlled her every movement as her pimp.

14  In mid-October, the defendant travelled with H.S. and two other women ("Kiki" and Keyshia

15  Henry, the defendant's "bottom" girl, or highest-ranked prostitute) to the Los Angeles area.  *Id*.  There,

16  H.S. and the two adult women worked as prostitutes for the defendant while they stayed at different

17  motels.  At some point in October 2015, the defendant reconnected through Facebook with A.S., who

18  had previously worked as a prostitute for him but had run away to Las Vegas to escape the the

19  defendant's violent and abusive treatment of her.  *See* Interview of A.S., MCNEELY-037705-12,

20  attached to this Memorandum as Exhibit A.  On or about October 27, 2015, the defendant drove from

21  Los Angeles to Las Vegas, where he picked up A.S. and brought her back to Los Angeles.  *Id*. at

22  MCNEELY-037707.  On their way back, the defendant took A.S.'s identification away from her so she

23  could not run away from him.  *Id*.  When they arrived in Los Angeles, A.S. met H.S. for the first time

24  and then returned to a life of prostituting for the defendant.  *Id*.  A.S. worked for the defendant and gave

25  him all of the money that she earned because he gave her heroin, which she desperately craved to satisfy

26

27  [2] The defendant knew that he was picking up H.S. at her mother's house because messages between
them on the day he picked her up show that she had to wait for her mother to leave before she could

28  sneak out of the house.

1  her addiction.  *Id*.  After a few weeks, the defendant, H.S., A.S., and Henry returned from Los Angeles

2  to Oakland, where they lived together at the Parklane Motel and worked as prostitutes every day until

3  the three women were arrested on January 21, 2016.

4        Life working as a prostitute for the defendant meant long hours, performing repeated sex acts

5  with total strangers, the threat of rape, and no money in return for their work because the defendant kept

6  all of the profits.  H.S., A.S., and the other women who worked for the defendant performed multiple

7  sex acts per day, either in their motel room or in the car of the customer.  *Id*. ¶ 23.  The women found

8  customers either by posting ads on web sites such as Backpage.com, which the defendant paid for using

9  Bitcoin, or by walking on dangerous thoroughfares that are known as high-prostitution areas, such as

10  International Boulevard in Oakland.  *Id*. ¶¶ 24-25.  The defendant gave the women condoms and

11  lubrication and instructed them on how much to charge for various sex acts and what outfits to wear.  *Id*.

12  ¶ 39.  According to A.S., she had approximately eight to ten "dates" per day/night, and from those she

13  would make around $800-$1,000 per day.  Exhibit A at MCNEELY-037710.  The women never got to

14  keep any of the money they earned, but instead had to give it all to the defendant.  *Id*., *see also* PSR ¶

15  35.  The defendant made the women get matching tattoos that included his nickname "Gangsta Sleepy"

16  as a way to show that they were his property.  PSR ¶¶ 36, 40.  In sum, the defendant controlled every

17  aspect of the lives of the victims while they performed multiple sex acts per day on total strangers in

18  order to fund his lifestyle.

19        Physical intimidation violence was integral in the defendant's ability to keep the victims in this

20  case compliant and working for him.  He beat H.S. regularly, at times so bad that "she thought she was

21  going to die."  *Id*. ¶ 30.  According to both H.S. and A.S., the defendant regularly carried a gun.  *Id; see*

22  *also* Exhibit A at MCNEELY-37709 (A.S. told law enforcement that the defendant "always had a small

23  revolver on him.").  In one instance, the defendant got angry with H.S. after she attempted to run away,

24  grabbed her, pulled out a gun and hit her with it, and then put the gun in her mouth.  *Id*. ¶ 31.  On

25  another occasion, the defendant became angry after H.S. communicated with another man named "Rico"

26  on Instagram, and then beat her with a closed fist, pulled her hair, and choked her so she could not

27  breathe.  *Id*. ¶ 32.  Later that day, the defendant made H.S. take a photograph with "Rico" in order to

28

4

humiliate her.  *Id.*

The defendant was also violent with A.S., and one occasion tried to stuff her into a suitcase.  *Id.* ¶ 33; *see also* Exhibit A at MCNEELY-037708.  Once, A.S. tried to hide some of the cash she made from prostitution from the defendant in her purse because she hoped to return to Ohio, where she is from, and get sober.  The defendant found that money and choked her, pushed her, and hit her with an open hand to punish her.  *Id.* ¶ 39; *see also* Exhibit A at MCNEELY-037708.  Ms. Henry was also physically abused by the defendant, who once stomped on her back and legs so badly that Ms. Henry had to go to the hospital, where she was told her spinal cord could have been severed.  *Id.*  Another time, the defendant beat H.S. and Ms. Henry with a curling iron cord while they were naked in the shower because the two women were creating drama.  *Id.* ¶ 33.  In sum, the defendant beat and threatened the victims repeatedly so that they would be too afraid to run away from him, thereby ensuring that he would continue to make money from their prostitution.

With respect to A.S., the defendant used not only violence but her addiction to ensure that she kept working for him.  *Id.* ¶ 40.  Because she craved heroin and could get it from the defendant, A.S. remained with him and continued to work for him, despite his physical abuse and the fact that he kept all the money.  *Id.*  The defendant knew about and took advantage of A.S.'s addiction, telling her "if you stay with me, you won't get sick."  Exhibit A at MCNEELY-037706.  He even controlled the way she ingested heroin, telling her to short or smoke it, so that she would be able to continue to work for him. *Id.*  When A.S. would use heroin in a way that the defendant did not approve of—such as using a needle to shoot it, which could leave a scar, or doing too much of it, which would make her unable to work— the defendant would beat her and withhold heroin from her.  *Id.*  Once, after catching A.S. using heroin with a needle, the defendant picked A.S. up by the neck with one hand and then stuffed her into a suitcase while he continued to choke her.  *Id.*  A.S. repeatedly asked the defendant for methadone in the hopes of getting clean, but the defendant stalled, telling her that he would get it for her later, which he never did.  *Id.*

## III.    CRIMINAL HISTORY (PSR ¶¶ 58-79)

The government agrees with Probation that the defendant falls in Criminal History Category IV.

1    Particularly troubling is the defendant's 2014 conviction for Dissuading a Witness by Threat or Force.

2    *Id.* ¶ 69.   In that case, the defendant told the victim of an alleged crime committed by one of the

3    defendant's friends that he was "already fighting too much" and warned her not to "put me in a situation

4    I don't want to be in."  *Id.*  He then threatened to kill the victim.  *Id.*  This conviction evidences the

5    defendant's lack of respect for the criminal justice system.

6    **IV.     SENTENCING GUIDELINES CALCULATIONS (PSR ¶¶ 47-57)**

7            The government disagrees with the calculation of the defendant's Guidelines in the PSR, and

8    believes they should be two points higher.  The PSR in this case calculates the defendant's Total Offense

9    Level to be 30.  *Id.* ¶ 57.  The government believes that the defendant's Total Offense Level should be

10   32.  The government agrees that the defendant's Base Offense Level is 28 pursuant to U.S.S.G. §

11   2G1.3(a)(3). The government also agrees that two levels should be added because the defendant used an

12   interactive computer service to facilitate the travel of the victim, pursuant to § 2G1.3(b)(3)(A), and

13   another two levels should be added because the offense involved the commission of a sex act, pursuant

14   to § 2G1.3(b)(4)(A).  The government believes, however, that two additional levels should be added

15   because the defendant used undue influence to get H.S. to work as a prostitute for him, which the PSR

16   does not include.

17     A.   The Two-Level Enhancement for Undue Influence Should Apply

18           The discrepancy in the Guidelines calculation arises because the government believes a two-level

19   enhancement pursuant to U.S.S.G. § 2G1.3(b)(2)(B) is applicable because the defendant unduly

20   influenced a minor, H.S., to engage in prohibited sexual conduct.  The commentary to this enhancement

21   advises the following:  "In determining whether subsection (b)(2)(B) applies, the court should closely

22   consider the facts of the case to determine whether a participant's influence over the minor

23   compromised the voluntariness of the minor's behavior."  U.S. Sentencing Guidelines Manual § 2G1.3

24   cmt. N.3(B).  The commentary goes on to say that "In a case in which the participant is at least 10 years

25   older than the minor, there shall be a rebuttable presumption that subsection (b)(2)(B) applies.  In such a

26   case, some degree of undue influence can be presumed because of the substantial difference in age

27   between the participant and the minor."  *Id.*  The Ninth Circuit found that this enhancement applied in a

28

6

1   case where pimps used coercion, physical altercations, and financial pressures to get minors to work as

2   prostitutes.  *U.S. v. Hornbuckle*, 784 F.3d 549, 555 (9th Cir. 2015).  In that case, the evidence showed

3   that the defendants used violence to convince the minor victim that "she had nowhere to go" and that the

4   victims were "forced…to work when they did not want to."  *Id.*  In addition, the defendants in

5   *Hornbuckle* "controlled every aspect of the minors' lives, including time and place of work, choice of

6   clothing, and access to money and food."  *Id.*

7          To begin, there is a rebuttable presumption in this case because H.S. was 14 years old when she

8   worked as a prostitute for the defendant, while the defendant was 33 years old at the time. U.S.

9   Sentencing Guidelines Manual § 2G1.3 cmt. N.3(B).  Furthermore, the undue influence enhancement

10  applies because the defendant controlled every aspect of H.S.'s life, using a number of techniques—

11  including violence, coercion, and even at times emotional support—to get her to continue prostituting

12  for him.  He brought H.S. to Oakland and isolated her from her family, friends, and everything that she

13  knew, meaning that she was completely defendant on him for food, shelter, and clothing.  *See* Interview

14  of H.S., McNeely-046088, attached to the Government's Sentencing Memorandum as Exhibit B.  The

15  defendant provided housing for H.S., as they lived primarily at the Parklane Motel in Oakland, so if H.S.

16  left him, she would have nowhere to go and nowhere to stay.  PSR ¶ 23.  While she was working, the

17  defendant kept tabs on H.S. by using a cell phone location application so that he knew where she was at

18  all times.  *Id.* ¶ 26.  The defendant told H.S. how much to charge for sex acts, and H.S. informed the

19  defendant how much money she made for each "date" and then gave him all of her earnings.  *Id.* ¶ 28.

20  He also controlled her body, as the defendant had sex with H.S. multiple times.  He also forced her to

21  get a tattoo that signaled his ownership over her, as H.S. wanted a tattoo of her mother's name, but the

22  defendant convinced her to get a tattoo of his pimp moniker "Gangsta Sleepy" on her back instead.  *Id.*

23         The defendant also physically abused H.S. regularly, including beating her so badly at times that

24  she "thought she was going to die."  *See* Exhibit B at MCNEELY-046088.  He owned guns and H.S.

25  believed that he carried a gun every day.  *Id.*  On one occasion, he threatened to kill H.S. and put a gun

26  in her mouth after H.S. tried to run away.  *Id.*  It is also true that, at times, the defendant was kind to H.S.

27  and the other victims, including one instance when he took them out for a night on the town and paid for

28

1  everything to celebrate A.S.'s birthday.  *Id.*  By showing occasional kindness, he convinced H.S. that he

2  loved her and that she should stay with him and continue to work for him.

3          Finally, to the extent that the defendant argues he could not have unduly influenced H.S. because

4  she "voluntarily" prostituted for him or because she had previously engaged in prostitution, the Ninth

5  Circuit in *Hornbuckle* expressly rejected this exact argument and found that evidence of the minor

6  victim's willingness to engage in prostitution does not mean that undue influence of a minor is not

7  present.  *Hornbuckle*, 784 F.3d at 556.  The *Hornbuckle* court noted that five other circuit courts have

8  ruled similarly.[3]  *Id.*  The court held that "a minor's prior, voluntary acts of prostitution do not preclude

9  a finding that she or he was unduly influenced to engage in subsequent acts of prostitution."  *Id.*  The

10  Court should find that the defendant unduly influenced H.S. to work for him as a prostitute in this case,

11  and add the corresponding two-level enhancement.

12      B.  Acceptance of Responsibility

13          The government does not object to a two-level reduction for acceptance of responsibility because

14  he did ultimately plead guilty.  However, the government notes a few points.  First, the defendant pled

15  guilty to a count that carries a ten year mandatory minimum, but has not pled guilty to other charged

16  counts that carry a 15-year mandatory minimum.  Next, the defendant pled guilty on the eve of trial and

17  after the parties' filings were due, after withdrawing a prior plea to the same charge a year earlier.  Next,

18

---

19  [3] *Hornbuckle*, 784 F.3d at 556: "These circuits have unanimously concluded that evidence of a victim's willingness is insufficient to compel a finding of no undue influence. *See United States v. Reid,* 751 F.3d

20  763, 768 (6th Cir.2014) ("It makes no difference that J.H. 'was not handcuffed to a bed' or 'kidnapped off the street.' The undue-influence enhancement 'is not limited to force, fraud, or coercion.' It also

21  reaches 'manipulating' and 'preying upon' a vulnerable victim—just what we have here." (internal citations omitted)); *United States v. Watkins,* 667 F.3d 254, 265 (2d Cir.2012) (affirming finding of

22  undue influence, and observing "that [the victim] actively was pursuing a relationship with [the defendant] does not require a different conclusion"); *United States v. Hagen,* 641 F.3d 268, 271 (8th

23  Cir.2011) (holding finding not clearly erroneous, despite claim that "victim traveled freely with defendant"); *United States v. Miller,* 601 F.3d 734, 737–38 (7th Cir.2010) (evidence of victim's

24  willingness did not render finding of undue influence clearly erroneous); *United States v. Lay,* 583 F.3d 436, 439 (6th Cir.2009) (holding that the finding of undue influence was not clearly erroneous, and

25  observing that evidence of minor's willingness was "consistent with a victim who has been influenced by a sexual predator"); *Anderson,* 560 F.3d at 283 (finding of undue influence not clearly erroneous

26  even though victims began engaging in prostitution before they met defendant because evidence showed that the victims were afraid to leave him)."

27

28

8

even in the PSR, the defendant does not appear to fully accept responsibility for the crime he is pleading to, transporting a child across state lines for purposes of prostitution.  He minimizes his responsibility by blaming the victim for pursuing him and making him feel guilty, and he claims that he was being altruistic when he went to pick her up in Oregon because he "just wanted to help her."  PSR ¶ 45.  The evidence, however, overwhelmingly shows that the defendant intended to prostitute H.S. as soon as she arrived in Oakland, which he did.  The defendant also fails to admit that H.S. did, in fact, work for him as a prostitute.  The defendant's failure to accept responsibility for his actions suggests that he is a higher risk to recidivate when he is released from prison.  The Court can and should consider the defendant's minimization of his blameworthiness for the instant offense when crafting the sentence.

As the defendant is in Criminal History Category IV, if the Court adopts the Guidelines Range contemplated by the PSR, the defendant's Guidelines range is 135-168 months.  If the Court includes the two-level enhancement for undue influence, the defendant's Guidelines range would be 168-210.  Probation recommends a 168-month sentence, which represents the high end PSR's calculated Guidelines Range.  The government believes that a sentence of 192 months is appropriate in this case, which represents the middle of the Guidelines Range including the two-level enhancement.

## V.      SENTENCING RECOMMENDATION

### a.  Applicable Law

Section 3553(a) directs courts to consider a number of factors in determining an appropriate sentence.  In this case, these factors indicate that a sentence of 192 months is sufficient, but not greater than necessary, to achieve the goals of sentencing.  *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  The key factors are the nature and circumstances of the offense and the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1), the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, *id.* § 3553(a)(2)(A); and the need to protect the public from further crimes of the defendant, *id.* § 3553(a)(2)(C).

Although the Supreme Court's decision in *Booker* has rendered the Sentencing Guidelines advisory, the Guidelines still remain the "starting point and initial bench-mark" for sentencing.

1    *Kimbrough v. United States*, 552 U.S. 85, 108, (2007) (internal quotation marks and citation omitted);

2    *see Carty*, 520 F.3d at 991 (en banc); *United States v. Ellis*, 641 F.3d 411, 415 (9th Cir. 2011).  While

3    there is no presumption of reasonableness for a Guidelines range sentence, if a district judge "decides

4    that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure

5    that the justification is sufficiently compelling to support the degree of the variance."  *Carty*, 520 F.3d at

6    991-992 (citing *Gall v. United States*, 552 U.S. 38, 50, (2007)); *see also United States v. Munoz-*

7    *Camarena*, 631 F.3d 1028, 1030 (9th Cir. 2011) ("district court must start with the recommended

8    Guidelines sentence, adjust upward or downward from that point, and justify the extent of the departure

9    from the Guidelines sentence.").  As the Supreme Court recognized in *Gall*, "a major departure should

10    be supported by a more significant justification than a minor one."  552 U.S. at 50.  Finally, "[a]s a

11    general rule, the preponderance of the evidence standard is the appropriate standard for factual findings

12    used for sentencing."  *United States v. Armstead*, 552 F.3d 769, 777-78 (9th Cir. 2008); *see, e.g.*, *United*

13    *States v. Treadwell*, 593 F.3d 990, 1001 (9th Cir. 2010).

14           **b.   A Sentence of 192 Months' Imprisonment Would Vindicate the Interests Set Forth**
                    **in 18 U.S.C. § 3553(a)**

15

16           The defendant's conduct requires a significant custodial sentence in order to punish his violent

17    and harmful crimes against multiple victims, including a minor.  The defendant met a vulnerable 14-year

18    old girl online in the spring of 2015, and then spent months grooming her and exchanging hundreds of

19    messages with her.  He ultimately convinced her to run away from her home in Oregon and travel with

20    him, an adult man whom she had never met before, to Oakland, California.  The defendant portrayed a

21    glamorous, lavish lifestyle to H.S. and she believed that her life with the defendant would be lucrative

22    and fun.

23           It turned out to be exactly the opposite.  The day after she arrived in Oakland, H.S. was out on

24    International Boulevard working as a prostitute, with the defendant acting as her pimp.  H.S. was

25    completely alone in Oakland—she knew no one in the Bay Area and was isolated from her family and

26    friends.  He controlled every aspect of her life and kept track of her movements.  The defendant kept

27    every dollar H.S. made from prostituting while exerting minimal effort.  H.S. said that she and the other

28

10

1    prostitutes were too afraid of the defendant to try and keep any of the money.  Exhibit B at MCNEELY-

2    046090.  The defendant was able to keep H.S. working as a prostitute for him by alternating between

3    showing her affection and intimidating her with violence.  H.S., only 14 years old at the time, was

4    dependent on the defendant and believed that he cared for her.  In reality, the defendant cared only about

5    using H.S. to make money.[4]  After H.S. was raped, the defendant expressed little concern for her safety

6    or well-being; instead, he sent her back out to prostitute almost immediately.  Exhibit B at MCNEELY-

7    046091.

8         To the defendant, H.S., A.S., and the other women who have prostituted for him were his

9    property and nothing more than a source of income.  He tricked or convinced them into getting tattoos of

10   his moniker "Gangsta Sleepy," which is a common practice among pimps to show ownership over their

11   prostitutes.  When the victims acted in a manner that the defendant did not approve of, he beat them

12   viciously.  He beat another one of the prostitutes who worked for him, Keyshia Henry, so badly that she

13   had to go to the hospital.  The defendant carried guns and used them to intimidate the victims, including

14   one time hitting H.S. in the face with a gun and then sticking the gun down H.S.'s throat and threatening

15   to kill her in front of A.S. and Ms. Henry.  Exhibit B at MCNLEEY-046088.  In another instance, he

16   punished H.S. for talking to another individual on Instagram by hitting her with a closed fist, pulling her

17   hair, and choking her until she could not breathe.  *Id*. at MCNEELY-046089.  The defendant then made

18   H.S. take a picture with that person in order to humiliate her.  *Id*.  He provided A.S.with the heroin that

19   she craved, and then punished her or beat her when he felt that she used too much or used it in a way

20   that would prevent her from making him money as a prostitute.  Through it all, the defendant was proud

21   of his behavior, posting pictures on social media of him with the victims in order to make himself appear

22   to be powerful and attractive to women, bragging to others about how many prostitutes he had, and

23   keeping all of the money that the victims made for himself.  The defendant has a tattoo that stands for

24   "Money Over Bitches," a common tattoo amongst pimps, and one that sums up his behavior towards the

25   victims – they were nothing but sources of profit and status to him, and he treated them accordingly.

26

27   _____

[4] The Minor Victim may attend the sentencing hearing, and the government will elaborate on the impact

28   that defendant's crimes have had on her at that hearing.

1     There is also evidence that the defendant knew how old H.S. was when he picked her up

2  (although H.S. did lie to the defendant about her age and said she was 20 years old).  First, he picked

3  H.S. up at her mother's house, which is a sign that she was not an adult.  The defendant then gave H.S. a

4  fake ID to buy marijuana on their drive from Oregon to Oakland.  PSR ¶ 20.  Next, according to H.S.,

5  someone on Facebook told the defendant how old H.S. really was, and though the defendant confronted

6  her about her real age, he did not seem to care.  Exhibit B at MCNEELY-046090.  Instead, he told H.S.

7  that she had a "baby face."  A.S. told law enforcement that at the Parklane Motel, H.S. would regularly

8  watch cartoons and did not know how to do her make up or hair.  Exhibit A at 037707.  More than once,

9  A.S. told the defendant that H.S.'s body did not appear to be fully developed, but the defendant would

10  say that he was not worried about it or would take care of it.  *Id*.  Once, after A.S. walked in on the

11  defendant and H.S. having sex, the defendant made comments alluding to the fact that H.S. was

12  inexperienced sexually.  *Id*. at MCNEELY-037707-08.  While the defendant denies that he knew how

13  old H.S. really was, there is evidence to suggest that he either did know, or consciously avoided

14  knowing, that she was in fact 14-years old.[5]

15     In short, the defendant pimped multiple women, one of them a 14 year old girl, for more than

16  three months, taking every dollar they made from performing sex acts on strangers while regularly

17  beating them and controlling every aspect of their lives.  Evidence in this case shows that the defendant

18  was proud of his work and the lifestyle he led, while at the same time doing tremendous harm, both

19  physical and psychological, to the victims in this case.

20     Along with a custodial sentence and supervised release to follow, the Court should order

21  restitution so that H.S. and A.S. can recover what the defendant stole from them.  The parties are

22  working on a final restitution amount.

23     Finally, the government submits that the Court should submit the following expanded search

24  condition as part of the defendant's terms of supervised release once he is released from custody:

25     The defendant shall submit her person, residence, office, vehicle, electronic devices and
          their data (including cell phones, computers, and electronic storage media), and any

26

27  ---
    [5] It is also worth noting that according to A.S., when she first met the defendant and worked for him as a
    prostitute, the defendant had another prostitute working for him who told A.S. that she was 17 years old.

28  Exhibit A at MCNEELY-037706.

1
2
3

property under defendant's control to a search.  Such a search shall be conducted by a
United States Probation Officer or any federal, state, or local law enforcement officer at
any time, with or without suspicion.  Failure to submit to such a search may be grounds
for revocation; the defendant shall warn any residents that the premises may be subject to
searches.

4
5
6
7

Given the defendant's conduct for which he is to be sentenced, including the fact that he met and
groomed a 14 year old girl for prostitution using his cell phone and carried guns during the commission
of this offense, the requested condition is necessary to serve the interests of deterrence and
rehabilitation.  The Court should also impose the other conditions requested by the Probation Officer.

8       **VI.      CONCLUSION**

9
10
11
12
13
14
15
16

The government respectfully submits that the recommended sentence of 192 months'
imprisonment "reflect[s] the seriousness of the offense," "promote[s] respect for the law," and
"provide[s] just punishment for the offense.  18 U.S.C. § 3553(a)(2)(A).  The recommended sentence
should deter defendant and others from grooming children online, and traveling across state lines for the
purpose of prostituting them.  Such a sentence, plus a lifetime of Supervised Release, would also protect
the public from defendant's future crimes.  Finally, in light of defendant's history and characteristics,
including the egregious nature of the sexual offenses against a child as well as against adult victims, a
192-month sentence would provide just punishment.

17
18
19
20
21
22
23
24
25
26
27
28

DATED:  October 2, 2019                          Respectfully submitted,

DAVID L. ANDERSON
United States Attorney


_____/s/_____
ROSS WEINGARTEN
SHAILIKA KOTIYA
Assistant United States Attorneys

13